## OFFRET v. INDUSTRIAL COMMISSION et al.

No. 5839. Decided February 9, 1937. (64 P. [2d] 1284.)

*Christenson, Straw & Christenson,* of Provo, for plaintiff.

*Joseph Chez,* Atty. Gen., and *F. A. Trottier,* of Salt Lake City, for defendants.

FOLLAND, Chief Justice.

Plaintiff herein applied to the Industrial Commission for an award of compensation for total and permanent disability resulting from an alleged accidental injury on May 19, 1935, while employed by and working for the Troy Laundry at Provo, Utah. He was at the time building engineer and re-

pairman. He claimed injury to his heart by reason of violent exercise while tightening a rusty burr inside a steam boiler at the laundry while he was in a cramped position with a wrench in each hand. The commission held two hearings and after deciding against the applicant, granted a rehearing. After such rehearing, the commission adopted the same findings and conclusions first made and denied compensation. The important finding of the commission is as follows:

"The commission finds that the disability complained of is not the result of any accidental injury arising out of or in the course of applicant's employment."

Offret is about forty-eight years of age and had been employed by the laundry for about eleven years, during the last three years as engineer and repairman. In July of 1934, he suffered from some ailment and consulted Dr. Merrill of Provo who then found him to be suffering from heart trouble and advised that he should at that time take a rest and that he should not engage in heavy manual work. After a rest of some weeks, he returned to his employment which at times did require heavy work. On May 19, 1935, he was engaged in making some repairs on the steam boiler. The fires had been drawn preparatory to making the required repairs. Offret removed about nineteen wheelbarrow loads of ashes from the ash pit and did other work around the outside of the boiler, all of which was somewhat strenuous. He then went into the space between the flues and the top of the boiler and in order to tighten the burr it was necessary for him to lie down on his right side and partly on his back and hold the bolt and a wrench in one hand while tightening the burr with a wrench in the other hand. While in this position, he claims to have been suddenly seized with a pain in his chest, accompanied by a feeling as if something had been torn. He lost action for a time and then continued his work and tightened the burr. He had to pull himself out of a manhole with the aid of a rope and then climbed down the ladder from the top of the boiler. By the time he reached the bot-

tom, he was so exhausted that he had to lie down for a while. He attempted to perform his duties of employment following this experience, but on the third day after he was unable to return and since that time has remained wholly incapacitated from doing any sort of work.

The manager of the laundry was present at the time Offret came out of the boiler. Offret made no complaint about having suffered any accidental injury, but the manager testified that he appeared to be exhausted and that his condition in that respect was self-evident; that during the day or two following he saw Offret sit down and rest frequently, which was an unusual thing for him to do. Applicant rested at home for a day or two and then came to Salt Lake City and consulted Dr. Martin C. Lindem, who examined and prescribed for him, following which Offret again consulted Dr. Merrill at Provo.

This is one of those cases where, had the commission found in favor of applicant and awarded compensation, the evidence in the record is ample to have supported such an award. The question before us, however, is whether the record is such that as a matter of law the commission must have found in favor of the applicant instead of finding against him as it did. The case, in this aspect, is similar to that of *Gerber* v. *Industrial Commission,* 91 Utah 479, 64 P. (2d) 1281, recently decided, except that the evidence in the instant case supporting applicant's claim to having suffered a heart attack from overexertion while engaged in the duties of his employment is very much stronger.

The commission's finding, quoted above, is susceptible of being divided into two parts: (1) That no accident occurred in the course of plaintiff's employment as alleged, and (2) that if such accident did occur, the present condition of plaintiff was not caused by or contributed to in any material degree by such strain or overexertion. In this case, the commission could not well have found that there was no strain or overexertion which affected the heart of the applicant on May 19, 1935, as such fact was not only testified to by

Offret, but his testimony was corroborated by the manager of the laundry and also by his helper, both of whom testified that his condition was one of exhaustion which was quite apparent at the time he came out of the boiler. We must, therefore, examine the second aspect of the question to determine whether there is evidence which sustains the finding of the commission that the condition it found the applicant to be in was not caused or contributed to in any material degree by the strain or overexertion on May 19th.

The particular type of heart trouble from which Offret was suffering was described by Dr. Viko, who examined plaintiff in July of 1935, as being a badly damaged heart of the type due to rheumatic infection, a marked mitral stenosis regurgitation, marked enlargement of the heart as confirmed by X-ray examination, and an irregularity shown by the electrocardiogram due to the premature beats.

The evidence from the physicians which tends to support and furnishes a sufficient basis for the commission's finding is as follows: Dr. Merrill, who had examined Offret on May 24, 1935, and also previously examined him in June of 1934, testified:

"Q. Would you say then his heart in May, 1935, was any better than it was in 1934? A. No.

"Q. Was it worse? A. So far as I could tell from my physical findings it was about the same. He had about the same thing on June 27th, 1934, that he had on May 24th, 1935, according to my findings. * * *

"Q. How long has he been afflicted with this heart condition to the best of your knowledge? A. He had that when he came to me, and the condition that he was in ordinarily that takes several years, but I could not get any history.

"Q. That is simply your opinion from your findings that must have prevailed for a considerable period of time? A. Yes.

"Q. And it is such a condition that he can continue at employment and continue to become progressively worse with the passing of time? A. As time progresses it gets worse. * * *

"Q. In other words would he be in the condition he is in today if he hadn't gone into the boiler? A. He may not have been in that condition for two or three years and he may be in it now.

"Q. You could not tell? A. That is something I could not say. They get in this condition sooner or later. * * *

"Q. Your advice a year previous to this time when he saw you practically a year before was that he must not engage in strenuous work? A. Yes.

"Q. Did he comply with your suggestion? A. He took the rest that we asked him to do, and then the man went on the job that he had to, to make a living. It was against our judgment to have that kind of work."

## Dr. Lindem testified as follows:

"A. I think that his decompensation just proceeded in a gradual way until he was totally unable to work.

"Q. Would you say he would be in the condition he is in now if he hadn't made an effort to loosen the bolt in the boiler? A. In my opinion the work he did at the laundry was so hard it would precipitate decompensation regardless of this.

"Q. Would you say if he hadn't performed this particular job going into this boiler which was an unusual thing for him to do that he would be in the condition he is in now? A. Yes, I believe this was a chronic heart that had arrived at a period of decompensation from the physical effort of his occupation and the progress of the disease in his heart.

"Q. If he hadn't gone into this boiler and indulged in this particular effort where he collapsed that his condition would be the same eliminating that entirely it would have occurred just the same? A. I believe he would be the same as he is today."

## Dr. Viko testified:

"For such a condition with such a heart the very act of living itself lowers that reserve even if the patient is lying in bed. * * *

"Q. As you saw the case in July evidently having no disturbance affecting the muscle tissue he had then recovered from it when you saw him in July? A. Yes.

"Q. And outside of lessening the reserve you found a condition similar to that which preceded the alleged injury? A. Similar, but I would not express the degree. * * * Any infection whether chronic or acute is a factor in this type of disease. * * * A. It is not possible to estimate the rate of progress in such a case because there is such a wide variation and it depends on strain and infection—infection even more than strain.

"Q. Is there anything unusual in this picture as you have the history leaving out the factor of the alleged injury or strain in the boiler? A. No, such progress is quite usual regardless of strain. * * *"

Dr. Viko also made a written report, in which is included the following:

"It is my opinion that this is a case of long-standing progressive heart disease with no accidental aggravation. His occupation no doubt served to hasten disability but it seems that no specific strain was an important factor."

In view of this evidence, we are unable to conclude that the commission's action in finding as it did was without sufficient support or that it was arbitrary or capricious. There was undoubtedly a conflict in the evidence on this matter and under the statute and the decisions of this court, it is for the Industrial Commission and not this court to make findings on contradicted evidence.

The order of the Industrial Commission denying compensation is affirmed.

EPHRAIM HANSON, MOFFAT, WOLFE, and LARSON, JJ., concur.